# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

KATHLEEN L. LARKIN,　　　　　　　 )　　　CASE NO. 1:17CV1139
　　　　　　　　　　　　　　　　　　 )
　　　　　　　　Plaintiff,　　　　　　 )　　　JUDGE JAMES S. GWIN
　　　　　　　　　　　　　　　　　　 )
　　　　　　　　v.　　　　　　　　　 )　　　MAGISTRATE JUDGE
　　　　　　　　　　　　　　　　　　 )　　　JONATHAN D. GREENBERG
NANCY A. BERRYHILL,　　　　　　　 )
　　　　　　Acting Commissioner　　　 )
　　　　　　of Social Security,　　　　 )
　　　　　　　　　　　　　　　　　　 )　　　**REPORT AND**
　　　　　　　　Defendant.　　　　　 )　　　**RECOMMENDATION**

　　　　Plaintiff, Kathleen L. Larkin, ("Plaintiff" or "Larkin"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends the Commissioner's final decision be VACATED and the case REMANDED for

further proceedings consistent with this decision.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

# I.  PROCEDURAL HISTORY

In October 2008, Larkin filed an application for POD and DIB, alleging a disability onset date of October 2, 2006 (later amended to March 3, 2007) and claiming she was disabled due to degenerative disc disease, osteoarthritis, and fibromyalgia.  (Transcript ("Tr.") 24, 85, 348, 386.) The application was denied initially and upon reconsideration, and Larkin requested a hearing before an administrative law judge ("ALJ").  (Tr. 187-190, 197-203, 204.)

On April 13, 2011, an ALJ held a hearing, during which Larkin (represented by counsel), an impartial vocational expert ("VE"), and medical expert ("ME") Hershel Goren, M.D., testified.  (Tr. 40-80.)  On June 29, 2011, the ALJ issued a written decision finding Larkin was not disabled.  (Tr. 140-156.)  On October 11, 2012, the Appeals Council remanded the claim to the ALJ for further proceedings.  (Tr. 157-159.)

On remand, the same ALJ conducted a second hearing on September 10, 2013, during which Larkin (represented by counsel), an impartial VE, and MEs Malcolm Brahms, M.D., and Alan Kravitz, M.D., testified.  (Tr. 81-106.)  On November 25, 2013, the ALJ issued a written decision finding Larkin was not disabled.  (Tr. 161-175.)  On May 5, 2015, the Appeals Council again remanded the claim for further proceedings, this time directing the case be assigned to a different ALJ.  (Tr. 182-185.)

On October 20, 2015, the new ALJ held a hearing, during which Larkin (represented by counsel) and an impartial VE testified.  (Tr. 107-137.)  On November 9, 2015, the ALJ issued a written decision finding Larkin was not disabled.  (Tr. 24-39.)  The ALJ's decision became final on April 4, 2017, when the Appeals Council declined further review.  (Tr. 1-6.)

On June 1, 2017, Larkin filed her Complaint to challenge the Commissioner's final

2

decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 11, 13, 14.)

Larkin asserts the following assignments of error:

(1) The administrative law judge erred in his evaluation of the opinions from Ms. Larkin's treating pain management specialist. He failed to provide "good reasons" for the weight he gave to Dr. Shah's opinions.

(2) The administrative law judge erred in his evaluation of the opinions from two testifying medical experts, Dr. Brahms and Dr. Kravitz, because he failed to evaluate their opinions under Social Security's own rules and regulations.

(3) The administrative law judge's analysis of credibility is faulty because he relied on mistakes of fact and a misreading of the record.

(Doc. No. 11.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Larkin was born in March 1957 and was fifty (50) years old at the time of her March 3, 2007 onset date and fifty-three (53) years old at the time of her December 31, 2010 date last insured. (Tr. 112, 348.) Thus, during the relevant period, Larkin was a "person closely approaching advanced age" (age 50-54) under social security regulations. *See* 20 C.F.R. §§ 404.1563(c),(d) & 416.963(c),(d). She has at least a high school education and is able to communicate in English. (Tr. 112-113.) She has past relevant work as a cashier (sedentary, skilled, SVP 5) and beauty shop manager (light, skilled, SVP 7). (Tr. 122-123.)

### B. Relevant Medical Evidence[2]

#### *Pre-Onset Date Treatment Records*

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs on the Merits.

3

The first medical record cited by the parties is dated March 14, 2005, two years prior to Larkin's amended onset date.  On that date, Larkin presented to pain management physician Bharat C. Shah, M.D., for a lumbar facet injection.  (Tr. 494.)  Shortly thereafter, she visited primary care physician Laurie Sabine, M.D., for a follow-up appointment for bronchitis.  (Tr. 832.)  Larkin reported "feeling good" but also complained of fatigue and depression.  (*Id*.)

Several weeks later, on May 11, 2005, Larkin underwent an MRI of her thoracic spine which showed "minimal multilevel discogenic degenerative changes of the thoracic spine with small posterior bulging disc and marginal osteophyte complex at C6-7 which creates mass effect on the anterior thecal sac to the left of midline and slight flattening of the anterior margin of the spinal cord."  (Tr. 718.)  This imaging also revealed a small bulging disc at the T5-6 and T9-10 levels with no mass effect on the spinal cord.  (*Id*.)  There was no evidence of thoracic disc herniation, or central canal or neural foraminal stenosis.  (*Id*.)

Larkin returned to Dr. Shah on August 8, 2005 with complaints of intermittent mild to moderate pain in her lower back radiating to her bilateral thighs and legs.  (Tr. 495-496.)  Larkin rated her pain a 7 on a scale of 10.  (*Id*.)  On examination, Dr. Shah noted normal gait and sensation but decreased reflexes.  (*Id*.)  He also found moderate tenderness to palpation and restricted range of motion in Larkin's lower back, as well as moderate tenderness to palpation in her mid-back.  (Tr. 496-497.)  Dr. Shah diagnosed degeneration of lumbar and thoracic intervertebral discs, continued Larkin on her medications, and ordered x-rays of her bilateral knees.  (Tr. 497.)  He also noted Larkin had seen a doctor at the Cleveland Clinic and was told she was not a candidate for surgery.  (*Id*.)  On August 19, 2005, Larkin underwent x-rays of her bilateral knees, which were negative.  (Tr. 719.)

4

Larkin returned to Dr. Shah for five office visits between August 2005 and February 2007.  In November 2005, she complained of intermittent mild to moderate lumbar pain radiating to her bilateral lower extremities.  (Tr. 497.)  Examination revealed the same findings as her previous visit, as well as restricted range of motion in Larkin's neck, positive Patrick's test bilaterally, and tenderness over the sacroiliac joints bilaterally.  (Tr. 498-499.) Dr. Shah ordered sacroiliac joint injections.  (Tr. 499.)  On May 10, 2006, Larkin reported feeling "significantly better in the low back area," rating her pain a 4 on a scale of 10.  (*Id.*)  Dr. Shah prescribed Oxyir.  (Tr. 501.)  In September 2006, Larkin reported feeling a "slight improvement" in her lumbar pain.[3]  (*Id.*)  She rated her pain a 3 on a scale of 10, and stated she was "doing well" with her current medications.  (Tr. 501, 504.)  The following month, Larkin indicated she was able to exercise "lightly" and had a slight improvement in her abilities to sit, walk, and drive.  (Tr. 504.) However, she also noted increased pain with prolonged standing.  (Tr. 505.)  In November 2006, Larkin reported a "general worsening" of her lower back pain after falling, which she rated a 5 on a scale of 10.  (Tr. 505, 507.)  Dr. Shah prescribed Flexeril for muscle spasms and ordered facet joint injections, which Larkin underwent in January and February 2007.  (Tr. 507-510.)

During each of the visits discussed above, Dr. Shah noted normal gait, normal sensation, decreased reflexes, and moderate tenderness to palpation and restricted range of motion in Larkin's lower back.  (Tr. 497-507.)  Dr. Shah continued to diagnose degeneration of Larkin's lumbar and thoracic intervertebral discs.  (*Id.*)

**Treatment Records from the Relevant Period (March 2007 through December 2010)**

---

[3] In addition, in August 2006, Larkin presented to Dr. Sabine with complaints of three to four migraines per month and insomnia.  (Tr. 831.)

The record reflects Larkin returned to Dr. Shah for four office visits between March and December 2007.  On April 9, 2007, Larkin reported pain in her lower back and bilateral shoulders.  (Tr. 524.)  She stated her back pain had improved by 80%, rating it a 3 on a scale of 10.  (*Id.*)  Larkin rated her right shoulder pain a 7 out of 10, and her left shoulder pain a 4 out of 10.  (*Id.*)  On examination, Larkin was in mild pain with abnormal reflexes, moderate tenderness to palpation in her neck and lower back, shoulder tenderness bilaterally, and normal but painful shoulder range of motion.  (Tr. 524-526.)  Dr. Shah continued her medications, which consisted of Oxycontin, Neurontin, Flexeril and Celebrex.  (Tr. 524, 526.)

On August 1, 2007, Larkin reported no lower back or shoulder pain but stated she was "having a lot of thoracic pain," which she rated a 6 on a scale of 10.  (Tr. 526-527.)  She indicated she had been "doing a lot of walking which aggravated her back," with the pain traveling to her bilateral hips.  (Tr. 528.)  Two months later, on October 1, 2007, Larkin complained of moderate lower back pain, bilateral shoulder pain, and "constant moderate left knee pain."  (Tr. 530.)  She rated her back pain a 7 on a scale of 10, and her knee pain a 6 on a scale of 10.  (*Id.*)  Physical examination findings were the same as her April 2007 visit, *supra*.  (Tr. 530-532.)  Dr. Shah ordered bilateral facet injections, which she underwent on October 5 and 12, 2007.  (Tr. 532-538.)  On December 28, 2007, Larkin reported her low back pain was "less intense" and 20% improved since her injections.  (Tr. 538-539.)  She continued to complain of bilateral shoulder pain and left knee pain.  (*Id.*)  Dr. Shah increased her Oxycodone dosage.  (Tr. 541.)

Meanwhile, on November 9, 2007, Dr. Sabine noted Larkin had undergone an EKG which "suggested an infarct of indeterminate age."  (Tr. 828.)  She assessed shortness of breath,

6

tachycardia, and abnormal CBC; and referred Larkin for a cardiology consult.  (*Id*.)

On November 13, 2007, Larkin began treatment with cardiologist Andrew Sakiewicz, M.D.  (Tr. 812.)  She indicated she had been diagnosed with postural orthostatis tachycardia syndrome ("POTS") five years prior.  (*Id*.)  Dr. Sakiewicz's handwritten treatment notes are difficult to read but it appears he ordered additional cardiac testing and began treatment for high blood pressure.  (*Id*.)  The record reflects Larkin underwent a Cardiac Adenosine Stress Test with Nuclear Imaging and Echocardiogram on November 21, 2007, both of which appear to have been normal.  (Tr. 815-818, 827.)

Larkin returned to Dr. Sakiewicz on December 3, 2007.  (Tr. 811.)  Dr. Sakiewicz noted Larkin's blood pressure was improved and described her POTS as stable.  (*Id*.)  During a visit on December 12, 2007, Dr. Sabine strongly encouraged Larkin to stop smoking.  (Tr. 827.)

Larkin again presented to Dr. Sakiewicz on January 2, 2008 and March 17, 2008.  (Tr. 809-810.)  In January, her hypertension was "slightly better" and her POTS was "under control." (Tr. 810.)  Dr. Sakiewicz advised Larkin to exercise regularly.  (*Id*.)  In March, however, Larkin reported three episodes of "near fainting."  (Tr. 809.)  Dr. Sakiewicz increased her Toprol dosage and assessed POTS and "near syncope."  (*Id.*)

On March 12, 2008, Larkin returned to Dr. Sabine with complaints of shortness of breath and fast pulse.  (Tr. 826.)  She stated "she cannot possibly do any exercise because of her back." (*Id*.)  Cardiology and pulmonary function testing were normal and Dr. Sabine concluded Larkin was deconditioned.  (*Id*.)

That same month, Larkin presented to Dr. Shah with complaints of increased pain in her lower back and left knee.  (Tr. 543-546.)  She estimated both her lower back and left knee pain

7

were an 8 on a scale of 10 and indicated she could not do any activity, especially standing.  (Tr.

543, 546.)  On examination, Dr. Shah noted as follows:

> Range of motion of the shoulders was normal but painful.  Shoulder tenderness
> was present over the left teres minor.  There was shoulder tenderness bilaterally
> over Bicipital tendon.  Ms. KATHLEEN had pain with both flexion and
> extension of the lumbar spine.  She had pain with lateral flexion bilaterally.
> There was facet tenderness bilaterally over the thoracic spine, over the mid to
> upper lumbar area, at L4-L5 and at L5-S1. Spinous process tenderness is
> present over the thoracic area.  left knee is painful with decreased [range of
> motion].

(Tr. 545.)  Dr. Shah also noted Larkin was in mild pain with abnormal reflexes.  (Tr. 544-545.)

Larkin indicated "medications are helpful but do not last long[;] she sweats a lot so cannot use

TENS [unit] properly[;] injections do not help."  (Tr. 546.)  Dr. Shah nonetheless administered

injections in Larkin's left knee.  (*Id*.)  He also ordered an MRI of Larkin's mid and lower back

and referred Larkin to a neurosurgeon.  (*Id*.)

Larkin underwent MRIs of her lumbar and thoracic spines on March 27, 2008.  (Tr. 512.

517.)  The lumbar MRI showed mild central disc bulging and very mild facet arthropathy at L3-

L4; mild bilateral facet atropathy at L4-L5; and broad based central and left paracentral disc

herniation (approximately 2-3 mm) at L5-S1.  (Tr. 517.)  This imaging indicated no spinal canal

or neuroforaminal stenosis.  (*Id*.)  The thoracic MRI showed (1) central disc osteophyte complex

of C5-C6 reducing the AP diameter of the spinal canal to 6 mm; and (2) multiple small central

disc herniations throughout the thoracic spine at T2-3, T3-4, T4-5, T5-6, T6-7, T7-8, and T10-11,

not resulting in significant spinal canal or neuroforaminal stenosis.  (Tr. 512.)

The record reflects Larkin returned to Dr. Shah for pain management evaluation and

treatment on five occasions between April and December 2008.  In April 2008, Larkin reported

worsening lumbar pain and "slightly more" left knee pain but improvement in her bilateral

shoulders.  (Tr. 547-548.)  Examination findings were the same as her previous visit.  (Tr. 547-552.)  Dr. Shah ordered lumbar epidural steroid injections, which were administered on May 2, 2008.  (Tr. 552-554.)  On May 19, 2008, Larkin reported continuous improvement in her lumbar pain and some "symptomatic improvement in the degree of her left knee pain."  (Tr. 554.)  She estimated "her low back pain at 4 and improvement of her low back pain at 40% and left knee pain [improvement] at 80%."  (*Id*.)  Dr. Shah continued Larkin on her medications.  (Tr. 558.)

In July 2008, Larkin reported "slightly more pronounced" lumbar pain, a "slight increase" in her right shoulder pain, and "slightly more" left knee pain.  (Tr. 559.)  Examination findings were the same as her previous visits.  (Tr. 559-563.)  Dr. Shah noted Larkin "is still having a lot of pain on activities such as cooking standing walking, etc."  (Tr. 563.)  He stated: "I think that she should think about pump to infuse narcotics intrathecaly and consider [filing] for disability."  (*Id*.)

Larkin returned to Dr. Sabine on September 17, 2008 with complaints of insomnia.  (Tr. 825.)  Examination revealed an elevated blood pressure (146/92) and heart rate ("in the 90s") but was otherwise normal.  (*Id*.)  Dr. Sabine assessed hypertension, tachycardia, insomnia and fatigue, and advised her not to nap during the day.  (*Id*.)

In October 2008, Larkin returned to Dr. Shah with reports of overall improvement in her pain.  (Tr. 563.)  She rated her low back pain a 4 and her left knee pain a 2 on a scale of 10.  (Tr. 564.)  Nonetheless, Larkin expressed an interest in having a morphine pump.  (Tr. 568.)  Dr. Shah referred her for a psychologist for approval for a pain pump trial.  (*Id*.)  The record reflects Larkin underwent a psychological evaluation with Raymond D. Richetta, Ph.D., on October 29, 2008.  (Tr. 519-522.)  Dr. Richetta determined "there is no evidence of a chronic pain disorder

with psychological factors predominating" and found "no psychological contraindications for an implanted morphine pump." (Tr. 522.)

Meanwhile, on October 14, 2008, Larkin returned to Dr. Sakiewicz for follow up regarding her hypertension and POTS.  (Tr. 808.)  She denied shortness of breath, chest pain, syncope and heart palpitations, and stated she was tolerating her medications well.  (*Id.*) Examination findings were normal including normal pulse and no edema.  (*Id.*)  Dr. Sakiewicz found Larkin's POTS was stable and continued her on her medications.  (*Id.*)

On November 11, 2008, Larkin returned to Dr. Shah with complaints of worsening lower back pain and "substantially more severe" right shoulder pain.  (Tr. 568.)  Larkin stated she would like to proceed with the pain pump trial.  (Tr. 572.)  On December 9, 2008, Larkin again reported worsening back pain and right shoulder pain which she rated a 7 and 5 on a scale of 10, respectively.  (Tr. 573.)   On examination, she was in moderately severe pain.  (*Id.*)  In addition to diagnosing degeneration of lumbar and thoracic intervertebral disc, Dr. Shah assessed bicipital tendonitis and subacromial bursitis.  (Tr. 576-577.)  He administered a right shoulder injection and continued Larkin on her medication.  (Tr. 577.)

On February 5, 2009, Larkin reported no change in her lower back or left knee pain but much reduced right shoulder pain.  (Tr. 577-578.)  She rated her lower back pain a 7 on a scale of 10.  (Tr. 578.)  On examination, Larkin was in mild distress and moderate pain.  (*Id.*)  Dr. Shah continued her on her medications.  (Tr. 583.)

On March 5, 2009, Dr. Shah completed a Medical Source Statement regarding Larkin's physical impairments.  (Tr. 587-588.)  Therein, Dr. Shah indicated Larkin suffers from arthralgias, back pain, joint pain, and joint stiffness.  (Tr. 588.)  He further stated Larkin had

10

"pain with flexion and extension of the lumbar," noting "range of motion in degrees not known." (*Id*.)  Dr. Shah indicated Larkin's left knee was painful with decreased range of motion.  (*Id*.)  In addition, he stated Larkin had a steady gait, did not use an ambulatory aid, and indicated "manipulation with hands is okay."  (*Id*.)  Dr. Shah opined Larkin should "not be involved with lifting, pushing or pulling."  (*Id*.)

On April 14, 2009, Larkin returned to Dr. Sakiewicz for follow up of her POTS and hypertension.  (Tr. 807.)  She denied syncopal episodes but had "felt somewhat lightheaded with standing."  (*Id*.)  Larkin also denied chest pain, shortness of breath, and heart palpitations.  (*Id*.)  Physical examination findings were normal, including no edema.  (*Id*.)  Dr. Sakiewicz described Larkin's POTS as stable and continued her on her medications.  (*Id*.)

Larkin was admitted to the hospital on April 23, 2009 for a surgical pain pump trial; i.e., insertion of a tunneled catheter to run a trial for intrathecal narcotics.  (Tr. 722-723, 738.)  On June 10, 2009, she reported "feeling much better," although she continued to report pain including increased left shoulder pain.  (Tr. 694.)  Dr. Shah indicated the pain pump trial went "very well" and reduced Larkin's pain more than 50%.  (Tr. 698.)  Larkin denied any side effects from her medications and indicated they were "controlling her pain."  (Tr. 694.)

Shortly thereafter, on June 18, 2009, Larkin underwent surgery for implantation of a permanent pain pump.  (Tr. 727-728.)  At that time, the pump was programmed to deliver 0.5mg of morphine per day.  (Tr. 728.)

Larkin returned to Dr. Shah twice in July 2009.  (Tr. 699-708.)  Although she reported some improvement, she continued to experience pain in her lower back, shoulders, and left knee. (*Id*.)  During each visit, Dr. Shah increased the morphine dosage of her pain pump, from 0.5mg

11

to 1.0 mg to 1.5mg per day.  (*Id.*)  He also began to wean Larkin off her Oxycontin pills.  (Tr. 703, 708.)  Larkin denied side effects from her medications.  (Tr. 704.)  The record reflects Larkin returned for pain pump refills in September, October and December 2009.  (Tr. 709-710.)  In October 2009, Larkin's morphine dosage was increased to 2.3 mg per day.  (Tr. 710.)

Meanwhile, on October 29, 2009, Larkin returned to Dr. Sabine for a yearly physical exam.  (Tr. 823-824.)  She reported "doing well" and physical examination findings were normal.  (*Id.*)

On November 2, 2009, Larkin returned to Dr. Sakiewicz with complaints of "chest heaviness up to once or twice daily over the last month," occasional dizziness, and a "faint feeling of mild degree with an upright standing position."  (Tr. 806.)  She denied heart palpitations and shortness of breath.  (*Id.*)  Physical examination findings were normal, with no edema.  (*Id.*)  An EKG taken that date showed the following: "normal sinus rhythm, QS morphology consistent with incomplete right bundle-branch block and the patient has left axis deviation, possible left anterior fascicular block."  (*Id.*)  Dr. Sakiewicz determined Larkin's POTS was controlled and her chest heaviness "is noncardiac and very atypical." (*Id.*)

Larkin returned to Dr. Shah on December 31, 2009, reporting improvement in her lower back and shoulder pain but worsening left knee pain.  (Tr. 711.)  She felt her overall pain levels had improved but stated "she still has pain when she does certain activities like vacuuming."  (Tr. 716.)  Larkin denied side effects from her medications.  (Tr. 711.)

On February 8, 2010, Larkin returned to Dr. Sabine.  (Tr. 822.)  She reported significant weight loss (18 pounds) and Dr. Sabine encouraged her to continue dieting.  (*Id.*)  Physical examination findings were normal.  (*Id.*)

12

Larkin returned to Dr. Shah for pain pump refills in February, April and June 2010.  (Tr. 772-773.)  At each of these visits, Larkin's pain pump dosage was increased (to 2.6 mg/day in February, 2.8 mg/day in April, and 3.497 mg/day in June.)  (*Id*.)  The record also reflects Larkin underwent an x-ray of her right knee on June 3, 2010, which showed mild degenerative changes and small non-specific joint effusion.  (Tr. 774.)

Meanwhile, on May 11, 2010, Dr. Shah completed a Medical Source Statement regarding Larkin's Physical Abilities and Limitations.  (Tr. 762-763.)  He determined Larkin could (1) stand for 15 minutes at one time and for a total of  60 minutes in an 8 hour day; (2) sit for 15 minutes at one time and for a total of 60 minutes in an 8 hour day; (3) lift and carry 0-5 pounds, both occasionally and frequently; (4) never stoop; (5) occasionally balance; (6) frequently finger and handle; (7) occasionally reach; (8) never work around dangerous equipment; (9) occasionally operate a motor vehicle; and (10) occasionally tolerate heat, cold, dust, smoke, and fumes.  (*Id*.)  Dr. Shah further concluded Larkin would need to elevate her legs for one hour during an 8 hour workday and, further, lie down for one hour during an 8 hour workday.  (*Id*.)  He described Larkin's pain as moderate and noted she had an intrathecal narcotic pump "due to severity of pain."  (*Id*.)  Dr. Shah indicated Larkin's pain pump would adversely affect her work performance.  (*Id*.)  He concluded Larkin's symptoms were severe enough to constantly interfere with her attention and concentration to perform even simple work tasks.  (*Id*.)  Finally, Dr.Shah found Larkin was likely to be absent from work four days/month or more as a result of her impairments or treatment.  (*Id*.)

On June 1, 2010, Larkin returned to Dr. Sakiewicz for follow up regarding her POTS. (Tr. 804-805.)  She reported worsening lower extremity swelling and a "few episodes of a

13

sensation of near fainting" while in an upright standing position.  (*Id*.)  Larkin denied heart

palpitations, heart racing, shortness of breath, chest pain, or chest pressure.  (*Id*.)  Physical

examination findings were normal, aside from trace to 1+ edema in her bilateral ankles.  (*Id*.)  Dr.

Sakiewicz detrmined Larkin's lower extremity edema was likely due to venous insufficiency.

(*Id.*)  He advised her to elevate her legs "as much as possible" and "avoid prolonged standing."

(*Id*.)  Dr. Sakiewicz also instructed Larkin to assume a sitting or laying position should she

experience any near fainting episodes.  (*Id*.)  He continued her on her medication.  (*Id*.)

     On June 3, 2010, Larkin returned to Dr. Sabine with complaints of "body jerks," tremors,

and "dropping things often."  (Tr. 821.)  Dr. Sabine determined she had hyperactive reflexes in

her bilateral upper and lower extremities, but no weakness or paresthesia (except in her feet).

(*Id*.)  She assessed tremora and neuropathy, in addition to obesity, hypertension, chronic back

pain, POTS syndrome, and hyperlipidemia.  (*Id*.)

     Larkin returned to Dr. Shah on August 3, 2010 for treatment of increased right shoulder

and left knee pain.  (Tr. 765-770.)  Examination findings were the same as previous visits.  (*Id*.)

Dr. Shah diagnosed degeneration of the lumbar and thoracic intervertebral discs; "other specified

disorders of the bursae and tendons in shoulder region;" fibromyalgia; "pain in joint involving

lower leg," and diabetes mellitus type II.  (Tr. 767.)  He administered a right shoulder injection

and continued Larkin on her medication.  (Tr. 770.)

     On November 15, 2010, Larkin returned to Dr. Shah reporting "a complex of symptoms."

(Tr. 900-906.)  She indicated "continuous improvement" of her lower back, right shoulder, left

shoulder, and left knee pain but stated "she has started to feel frequent mild left elbow pain."

(Tr. 900.)  She rated her back pain a 3/10; her right shoulder pain a 3/10; her left knee pain a

6/10; and her left elbow pain a 5/10.  (Tr. 901.)  Examination findings were the same as previous visits, as were Larkin's diagnoses.  (Tr. 900-903.)  The record reflects Larkin returned for a pain pump refill on December 28, 2010, at which time her morphine dosage was increased to 4.2 mg/day.  (Tr. 907.)

Dr. Sabine completed an undated questionnaire regarding Larkin's physical impairments and limitations.  (Tr. 591-593.)  She identified diagnoses of obesity, fatigue, and back pain.  (*Id*.)  Dr. Sabine noted Larkin's back pain was "managed elsewhere."  (*Id*.)  In response to a question regarding "all pertinent findings on clinical examination," Dr. Sabine stated "I have no information on this. To my knowledge she does not have any disabling conditions."  (*Id*.)  Finally, Dr. Sabine noted Larkin declined physical therapy and "has been non-compliant with my recommendations re weight loss and smoking cessation and exercise."  (*Id*.)

### *Post-DLI Medical Records*

On February 18, 2011, Larkin returned to Dr. Sakiewicz with complaints of shortness of breath, syncopal episodes, and hypertension.  (Tr. 894-897.)  She reported moderate bilateral lower extremity swelling; "gradually worsening" shortness of breath; and "multiple episodes of near-syncope."  (Tr. 894.)  On examination, Dr. Sakiewicz noted Larkin had normal gait and was able to stand without difficulty and undergo exercise testing.  (Tr. 896.)  He did, however, find 2+ edema in her bilateral lower extremities.  (*Id*.)  An EKG taken that date appears to have been abnormal.  (Tr. 894, 896.)  Dr. Sakiewicz ordered additional cardiac testing and blood work, and again advised Larkin to "avoid prolonged standing."  (Tr. 896-897.)

On April 27, 2011, Larkin returned for a pain pump refill at which time a solution of morphine and bupivacaine was injected and her dosage was increased to 4.6 mg/day.  (Tr. 908.)

15

Several weeks later, on June 1, 2011, Larkin returned to Dr. Shah with reports of improvement in her back and shoulder pain.  (Tr. 908-909.)  She continued to complain of knee pain, however, and injections were adminstered in her bilateral knees on that date. (Tr. 908-909, 912.)  The record reflects Larkin continued to report bilateral knee pain and received additional injections on June 15 and June 22, 2011.  (Tr. 913-917.)

Larkin returned to Dr. Shah on December 20, 2011.  (Tr. 918-921.)  She reported a significant increase in the severity of her lower back pain, as well as slight increases in her right shoulder and bilateral knee pain.  (Tr. 918.)  Larkin reported she was "unable to stand for periods longer than 10 minutes." (Tr. 921.)  Dr. Shah increased her pain pump dosage to 5.0 mg/day. (*Id*.)

Larkin continued to present regularly to Dr. Shah throughout 2012.  In February 2012, she complained of increased low back pain, which she rated a 9 on a scale of 10 and indicated was aggravated by bending, lifting, and walking.  (Tr. 922-923.)  Dr. Shah added a diagnosis of sacroiliitis and ordered lumbar x-rays and SI joint injections.  (Tr. 925-926.)  Larkin underwent the injections on March 8, 2012.  (Tr. 933-934.)  In April 2012, Larkin complained of severe back pain, which she rated a 10 out of 10.  (Tr. 926-927.)  Dr. Shah increased her pain pump dosage and stated "will submit for MRI thoracic and lumbar spine for failure of meds, injections, and [pump] not helping, [rule out] new herniations." (Tr. 930.)  Larkin's pain pump dosage was increased to 6.5 mg/day in September 2012, and she underwent lumbar facet joint injections in October 2012.  (Tr. 931, 934-937.)  In December 2012, Dr. Shah changed the solution in Larkin's pain pump to hydromorphone 8 mg/ml and bupivacaine 12 mg/ml.  (Tr. 939.)

Treatment records from 2013 show Larkin continued to complain of varying degrees of

16

pain in her lower back, bilateral shoulders, bilateral knees, and right arm.  (Tr. 970-988.)  She also reported pain in her upper back.  (Tr. 971.)  The record reflects Larkin's pain pump dosages were repeatedly increased over the course of the year.  (Tr. 974, 978, 983, 987-988.)  Larkin reported the hydromorphone was "helping her but she is still in a lot of pain [and] cannot do any of her activities without pain."  (Tr. 974.)  In addition, in April 2013, Dr. Shah noted Larkin was diabetic and had "open ulcers on lower left leg."  (Tr. 988.)

In 2014, Dr. Shah again increased Larkin's pain pump dosage and, ultimately, switched her pump medication to Fentanyl 1,000 mg/ml set to run at 100 mcg/mg.  (Tr. 1005, 1012.)  Larkin nonetheless continued to complain of pain "with increase in intensity to various areas."  (Tr. 1006-1010.)  She indicated "when she attempts to increase activities her pain does increase and is unable to complete task in one session, has to split up tasks into sections, does accommodate pain with rest periods to complete tasks."[4]  (Tr. 1010.)

In 2015, Larkin's pain pump Fentanyl dosage was increased to 165 mcg/mg, and then again to 180 mcg/mg.  (Tr. 1013-1014.)

## C.    State Agency Reports

During the April 13, 2011 hearing, medical expert ("ME") Hershel Goren, M.D., testified regarding Larkin's physical impairments.  (Tr. 56-67.)  He concluded Larkin suffered from "spine pain" and that her impairment or combination of impairments did not meet or equal a Listing.  (Tr. 56.)  At the request of the ALJ, Dr. Goren provided the following RFC for Larkin:

---

[4] The record also reflects Larkin established treatment with primary care physician Haralambie Siscu, M.D., and presented to her on a monthly basis between February and December 2014.  (Tr. 1015-1089.)  Dr. Siscu's treatment records indicate Larkin's diabetes worsened during this time period, resulting in skin ulcerations and, often, edema in her lower extremities.  (Tr. 1017, 1030, 1038, 1053.)

"Lift and carry 20 pounds occasionally, ten pounds frequently, no other exertional restrictions. Postural restrictions are as follows: never ladder, rope, or scaffold; occasional ramp or stairs; occasional stooping, kneeling, crouching, crawling, no unprotected heights."  (Tr. 56.)  Upon questioning by Larkin's counsel, Dr. Goren indicated he had not reviewed records from Larkin's cardiologist regarding her POTS and did not recall any evidence in the record regarding lower extremity swelling.[5]  (Tr. 57.)

Medical expert Malcolm Brahms, M.D., testified during the September 10, 2013 hearing. (Tr. 92-94.)  Dr. Brahms concluded Larkin was a "moderately obese individual who complains of low back pain, pain in the cervical region, knee pain, right shoulder pain, and elbow pain."  (Tr. 92.)  He found her impairments or combination of impairments did not meet or equal a Listing. (Tr. 93.)  Dr. Brahms opined Larkin was limited to sedentary[6] work as far back as 2007.  (*Id.*)  He

---

[5] The record reflects counsel for Larkin questioned Dr. Goren at length regarding this issue.  (Tr. 57-66.)  Dr. Goren testified "lower extremity swelling would not keep a person from working and would not cause any restrictions in the workplace," unless there was evidence of elephantitus or congestive heart failure.  (*Id.*)  Counsel for Larkin pressed Dr. Goren for some time, until the ALJ halted questioning on this topic in light of the fact Larkin's cardiology records were not yet in the record  and neither he nor Dr. Goren had had the opportunity to review them.  (Tr. 62.)  The ALJ indicated "if [these records] change Dr. Goren's testimony, I will call a supplemental hearing."  (*Id.*)

[6]  "Sedentary work" is defined as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 CFR § 404.1567(a). SSR 83–10 provides that "Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8–hour workday, and sitting should generally total approximately 6 hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

also found Larked could not climb ramps and stairs on an occasional basis; could never climb

ladders, ropes, or scaffolds; and was limited to occasional overhead reaching.  (Tr. 93-94.)

ME Alan Kravitz, M.D., also testified during the September 10, 2013 hearing.  (Tr. 94-

97.)  Dr. Kravitz first indicated he was a specialist in internal medicine with a sub-specialty in

cardiovascular medicine.  (Tr. 95.)  He concluded Larkin's severe impairments include severe

lumbosacral sprain and arthritis with sacroiliitis; multiple disorders of the bursa tendons

(particularly of the shoulder); degenerative lumbosacral intervertebral disc disease and

degenerative thoracic intervertebral disc disease.  (Tr. 95-96.)  Dr. Kravitz also noted Larkin had

fibromyalgia and diabetes mellitus, with no complications.  (*Id*.)  He found Larkin's impairments

or combination of impairments did not meet or equal a Listing.  (Tr. 96.)

> With regard to Larkin's RFC, Dr. Kravitz testified as follows:
>
> Q:    Doctor, are you able to give me a residual functional capacity
>       assessment for Ms. Larkin?
>
> A:    Yes, sir.  Your Honor, I -- I want to point out that this lady requires a
>       constant morphine drip with an apparatus in her -- in her spine, sort of
>       like a bag that's filled periodically with morphine and -- and drips out.
>       That's the only way she can function.  The answer to your question is
>       that her RFC is less than sedentary.  I do not believe she could do any
>       other sedentary activities as defined.
>
> Q:    So you're saying that she would not be able to sit for six hours out of
>       an eight-hour day?
>
> A:    No, sir, Your Honor .
>
> Q:    Okay .
>
> A:    Your Honor, the issue really is the intractable pain that she has.  It's
>       very unusual for someone to require opiate narcotics constantly that
>       she does.

(Tr. 96.)

On April 15, 2009, state agency physician Linda Hall, M.D., reviewed Larkin's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 610-617.)  Dr. Hall concluded Larkin could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of about 6 hours in an 8 hour workday; and sit for a total of about 6 hours in an 8 hour workday.  (Tr. 611.)  She found Larkin had an unlimited capacity to push/pull, balance, kneel, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds.  (Tr. 611-612.)  Larkin could frequently stoop and crouch, and was limited to frequent reaching with her right upper extremity.  (Tr. 612-613.)  Dr. Hall found Larkin had no visual, communicative, or environmental limitations.  (Tr. 612-614.)

On April 21, 2010, state agency physician Robert Keisman, M.D., reviewed Larkin's medical records and completed a Case Analysis.  (Tr. 752-753.)  He found "no evidence with which to disagree with" Dr. Hall's findings.  (Tr. 753.)

**D.  Hearing Testimony**

As noted above, the record reflects three hearings have been conducted in this matter. During the first hearing, conducted on April 13, 2011, Larkin testified to the following:

- She has a high school education, and previous work experience as a beautician, hair salon owner, and store manager.  (Tr. 42-43.)  She lives with her husband, who does most of the household chores.  (Tr. 45, 52.)

- She has suffered from chronic back pain since October 2006.  (Tr. 43.)  It hurts to stand, walk, and sit for any prolonged period of time, which she defined as more than 30 minutes.  (Tr. 43.)  She uses a cane when she has to "walk a distance."  (Tr. 46.)  She has used the cane for the past six months.  (*Id.*)  It was not prescribed by a doctor.  (*Id.*)

- Treatment for her back pain has included oral pain medication, physical therapy, and a pain pump.  (Tr. 46-48, 52.)  She declined her doctor's most recent recommendation of physical therapy because "it does not help, it makes me worse."  (Tr. 55.)  She had a morphine pain pump surgically implanted in mid

20

2009.  (Tr. 51.)  She is still in pain, but not as severe since the pain pump.  (Tr. 46-47.)

- She sees a cardiologist for high blood pressure and POTS.  (Tr. 49.)  As a result of these conditions, she has daily swelling in her legs, feet, and ankles.  (Tr. 49-50.)  She is supposed to lay down with her feet up whenever she can to alleviate the swelling.  (*Id.*)  She also suffers from migraines.  (Tr. 51.)  She gets them "quite often," and they each last between a few hours and three days.  (*Id.*)

- On an average day, she makes breakfast, lays down with her feet propped up on a pillow, watches TV, and does puzzles.  (Tr. 43-44.)  She occasionally visits her mother in North Carolina.  (Tr. 45.)

During the second hearing, conducted on September 10, 2013, Larkin testified as follows:

- She suffers from chronic back pain.  (Tr. 86.)  By October 2006, "it was getting to the point [she] couldn't control her pain."  (*Id.*)  Her pain is aggravated by sitting, standing, lifting, and bending.  (*Id.*)  She still has a morphine pump.  (*Id.*)  Her doctors continue to adjust the dosage.  (*Id.*)

- She continues to suffer from POTS.  (Tr. 87.)  When she feels an attack coming on, she sits down and "tries not to pass out."  (*Id.*)  She also continues to suffer from chronic migraines.  (*Id.*)  She has approximately 20 migraines per month, each lasting anywhere between four hours and "a couple of days."  (Tr. 87-88.)

- Her pain has gotten worse since the last hearing.  (Tr. 88.)  She sees her pain management doctor, Dr. Shah, every six weeks.  (*Id.*)  She also suffers from muscle spasms.  (Tr. 89-90.)  Since March 2007 (her amended onset date), she could not lift or be on her feet all day because her "neck would go into muscle spasms and pain."  (*Id.*)

- On an average day, she plays on the computer and watches TV.  (Tr. 92.)

Finally, during the October 20, 2015 hearing, Larkin testified as follows:

- She lives with her husband and is not currently working.  (Tr. 113.)  She last worked nine years ago.  (*Id.*)

- With regard to the period March 2007 through December 2010, she could not work because of her pain.  (Tr. 116.)  She had a pain pump that relieved "some of the pain but not all of it."  (Tr. 117.)  She would also have to take Tylenol IV twice per day.  (*Id.*)  She could not stand or sit for any length of time.  (Tr. 116-117.)  She had to use a stool to cook dinner or do the dishes, and had to sit down to vacuum.  (Tr. 116-117, 120.)  She used a cane because she was falling down.

(Tr. 117.)  Her pain medications made her fall asleep off and on during the day.  (Tr. 116.)

• In addition, during the March 2007 through December 2010 time period, she was elevating her legs because "they swell up real bad."  (Tr. 118.)  Both her cardiologist and her pain management physician advised her do so.  (*Id.*)  These doctors told her to elevate her legs above her heart "all day."  (*Id.*)  Most of the day she sits or sleeps in a tilt back chair with her legs elevated.  (*Id.*)

• During the relevant time period, she experienced "body jumps" and was always "dropping everything."  (Tr. 120.)

The VE testified Larkin had past work as a cashier I (sedentary, skilled, SVP 5) and beauty shop manager (light performed as medium, skilled, SVP 7).  (Tr. 122-123.)  The ALJ then posed the following hypothetical question:

I'd like you to assume hypothetical individual with those past jobs that you described.  I'd like you to further assume the individual's limited to sedentary work.  They could occasionally operate foot controls bilaterally, occasionally push or pull with the lower extremities, bilateral lower extremities, occasionally climb ramps or stairs, never climb ladders, ropes or scaffolds, never kneel or crouch.  They can occasionally reach overhead bilaterally.  And they must avoid all exposure to hazards, such as unprotected heights and moving machinery.  Can this person perform Ms. Larkin's past work?

(Tr. 124.)

The VE testified the hypothetical individual would be able to perform Larkin's past work as a cashier, but not as a beauty shop manager.  (Tr. 124.)  The VE further explained "the beauty shop manager-acquired skills would not transfer to a sedentary RFC," but "there are financial recordkeeping and bank deposit skills acquired in the cashier job that would transfer to similar [jobs]."  (Tr. 124-125.)  By way of example, the VE testified Larkin's transferable skills from the cashier I position would transfer to representative jobs such as check cashier (sedentary, semi-skilled, SVP 3), account adjustable clerk (sedentary, semi-skilled, SVP 3), and credit card clerk (sedentary, semi-skilled, SVP 3).  (Tr. 127-128.)

22

The ALJ then asked the VE to assume a second hypothetical that was the same as the first but with the additional limitation that the individual would have to elevate their legs above their heart while sitting.  (Tr. 129.)  The VE testified this restriction would take the individual off-task because "based on my experience, that a person to elevate to that level can't really do seated job tasks."  (*Id*.)

The ALJ then asked the VE to assume a hypothetical person who would be off task 20% of the time.  (Tr. 129.)  The VE testified there would be no jobs for such an individual.  (*Id*.)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order

to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe

impairment" is one that "significantly limits . . . physical or mental ability to do basic work

activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful

activity, has a severe impairment that is expected to last for at least twelve months, and the

impairment, or combination of impairments, meets or medically equals a required listing under

20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of

age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the

claimant's impairment or combination of impairments does not prevent him from doing his past

relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).

For the fifth and final step, even if the claimant's impairment does prevent him from doing his

past relevant work, if other work exists in the national economy that the claimant can perform,

the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Larkin was insured on her alleged amended disability onset date, March 3, 2007

and remained insured through December 31, 2010, her date last insured ("DLI.")  (Tr. 24-25.)

Therefore, in order to be entitled to POD and DIB, Larkin must establish a continuous twelve

month period of disability commencing between these dates.  Any discontinuity in the twelve

month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th

Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security
      Act on December 31, 2010.

2.    The claimant did not engage in substantial gainful activity during the period

24

from her alleged onset date of March 3, 2007 through her date last insured of December 31, 2010 (20 CFR 404.1571 et seq.)

3.    Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the lumbar and thoracic spines, pain in knees and lower extremity swelling, obesity, and postural orthostatic tachycardia syndrome (POTS) (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can only occasionally operate foot controls or push or pull with the lower extremities bilaterally.  She can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds.  She can never kneel or crouch.  She can only occasionally reach overhead bilaterally.  The claimant must avoid all exposure to hazards such as unprotected heights or moving machinery.

6.    Through the date last insured, the claimant was capable of performing past relevant work as a Cashier I.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant was not under a disability, as defined in the Social Security Act, at any time from March 3, 2007, the alleged onset date, through December 31, 2010, the date last insured (20 CFR 404.1520(f)).

(Tr. 24-32.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### Treating Physician Dr. Shah

In her first assignment of error, Larkin argues the ALJ failed to provide good reasons for discounting Dr. Shah's March 2009 and May 2010 opinions.  (Doc. No. 11 at 13.)  She argues the ALJ's reason for rejecting these opinions is both cursory and inaccurate.  (*Id*. at 14.) Specifically, Larkin asserts the ALJ's summary of Dr. Shah's treatment records misstated some of his physical examination findings and failed to acknowledge "the plethora of abnormal findings" such as tenderness to palpation, decreased and painful range of motion, and diminished reflexes.  (*Id*. at 14-15.)  Larkin further maintains the ALJ fails to adequately recognize or take

into account Dr. Shah's lengthy treatment relationship with Larkin, his specialization as a pain

management physician, or the fact he implanted and maintained Larkin's morphine pain pump.

(*Id.*)  Finally, Larkin notes the ALJ's failure to properly evaluate Dr. Shah's opinions is not

harmless in light of VE testimony there would be no work for a person who had to elevate her

legs when seated and/or was off task more than 10% of the time.  (*Id.*)

The Commissioner maintains the ALJ properly evaluated Dr. Shah's opinions.  (Doc.

No. 13 at 15.)  She argues the ALJ acknowledged Dr. Shah was a pain management specialist

and had a lengthy treatment relationship with Larkin.  (*Id.*)  The Commissioner argues, when the

decision is read as a whole, it is clear the ALJ provided "good reasons" for discounting Dr.

Shah's "extreme limitations," emphasizing the relatively benign objective imaging results,

Larkin's improvement with the pain pump, and her range of daily activities.  (*Id.* at 15-18.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain

standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710

F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical

opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c),[7] and "[t]he source

of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id.*  "As a

general matter, an opinion from a medical source who has examined a claimant is given more

weight than that from a source who has not performed an examination (a 'nonexamining

source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly

treats the claimant (a 'treating source') is afforded more weight than that from a source who has

---

[7] Revised versions of these regulations took effect on March 27, 2017 and apply to
disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)." *Id.*  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  Social Security Ruling ("SSR") 96–6p, 1996 WL 374180 at *2 (Soc. Sec. Admin. July 2, 1996).[8]

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart,* 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[9]  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[10]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not

---

[8]  SSR 96-6p was rescinded and replaced by SSR 17-2p, effective March 27, 2017.  *See* SSA 17-2p, 2017 WL 3928306 at * 1 (SSA Mar. 27, 2017).

[9]  SSR 96-2p has been rescinded.  This recession is effective for claims filed on or after March 27, 2017.  *See* SSR 96-2p, 2017 WL 3928298 at *1.

[10] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.[11]

---

[11]  "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.* It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

As discussed *supra*, Dr. Shah submitted two opinions regarding Larkin's physical functional abilities and limitations during the relevant time period. On March 5, 2009, Dr. Shah indicated Larkin suffers from arthralgias, back pain, joint pain, and joint stiffness. (Tr. 587-588.) He stated Larkin had "pain with flexion and extension of the lumbar," noting "range of motion in

---

supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R. § 404.1527(c). Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion. *Id.* § 404.1527(c)(6)." *Gayheart*, 710 F.3d at 376.

degrees not known." (*Id*.)  Dr. Shah also indicated Larkin's left knee was painful with decreased

range of motion.  (*Id*.)  He stated Larkin had a steady gait, did not use an ambulatory aid, and

indicated "manipulation with hands is okay."  (*Id*.)  Lastly, Dr. Shah opined Larkin should not

"be involved with lifting, pushing or pulling."  (*Id*.)

       A little over a year later, on May 11, 2010, Dr. Shah opined Larkin could:

- Stand for 15 minutes at one time and for a total of 60 minutes in an 8 hour day;

- Sit for 15 minutes at one time and for a total of 60 minutes in an 8 hour day;

- Lift and carry 0-5 pounds, both occasionally and frequently;

- Never stoop;

- Occasionally balance;

- Frequently finger and handle;

- Occasionally reach;

- Never work around dangerous equipment;

- Occasionally operate a motor vehicle; and

- Occasionally tolerate heat, cold, dust, smoke, and fumes.

(Tr. 762-763.)  Dr. Shah further concluded Larkin would need to elevate her legs for one hour

during an 8 hour workday and, further, lie down for one hour during an 8 hour workday.  (*Id*.)

He indicated Larkin's pain pump would adversely affect her work performance, and concluded

Larkin's symptoms were severe enough to constantly interfere with her attention and

concentration to perform even simple work tasks.  (*Id*.)  Finally, Dr. Shah found Larkin was

likely to be absent from work four days/month or more as a result of her impairments or

treatment.  (*Id*.)     The ALJ evaluated Dr. Shah's March 2009 and May 2010 opinions as

follows:

> Dr. Shah completed a medical source statement on March 5, 2009.  He said the claimant has back pain 7/10.  She also had joint pain and joint stiffness.  Claimant had pain with flexion and extension of the lumbar spine, but range of motion in degrees was not known.  Left knee was also painful with decreased range of motion.  Claimant could do manipulation with her hands.  She was not to be involved  in lifting, pushing or pulling.  Claimant's gait was steady,  and she did not use an ambulatory aide.  She was 5' 3" tall and weighed 213 pounds (Exhibit 5F).  Little weight is given to this opinion, as it is not consistent with the record as a whole.  Back pain does not support a complete limitation against lifting.  Dr. Shah did not know a basic finding as to range of motion in the lumbar spine.

> * * *

> Dr. Shah completed a medical source statement regarding physical abilities and limitations on April 5 [sic], 2010 (Exhibit 19F).  He said the claimant can stand for 15 minutes at a time and less than 60 minutes in an 8-hour day.  She can sit for 15 minutes at a time.  He limited the claimant to lifting and carrying 0-5 pounds frequently.  He said she could  reach with the right upper extremity occasionally.  He said she needed to elevate her legs for one hour during an 8-hour day and she needed to lie down for one hour during an 8-hour day (Exhibit 19F/2).  He also said the claimant would miss 4 days of work or more per month due to impairments or treatment (Exhibit 19F/3).  Little weight is given to this opinion, as it is not consistent with the record as a whole.  Dr. Shah's records do not mention a recommendation for the claimant to elevate her legs prior to December 31, 2010 (Exhibit 1F, 3F, 9F, 20F).

(Tr. 30-31.)  The ALJ assessed the following RFC: "After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can only occasionally operate foot controls or push or pull with the lower extremities bilaterally. She can occasionally climb ramps or stairs, but never climb ladders, ropes or scaffolds. She can never kneel or crouch. She can only occasionally reach overhead bilaterally. The claimant must avoid all exposure to hazards such as unprotected heights or moving machinery."  (Tr. 28.)

With regard to Dr. Shah's May 2010 opinion, the Court finds the ALJ failed to provide

"good reasons" for rejecting this opinion.  As an initial matter, the Court notes the ALJ rejected

virtually all of the specific functional limitations set forth in Dr. Shah's May 2010 opinion.

Specifically, the ALJ acknowledged and accorded "little weight" to Dr. Shah's opinions

regarding Larkin's abilities to sit, stand, and lift/carry, as well as his opinions regarding the need

for her to elevate her legs, lie down, and have four or more absences per month.  (Tr. 30-31.)

However, the ALJ failed, at any point in the decision, to acknowledge or address Dr. Shah's

numerous other opinions, including his opinions Larkin could never stoop, occasionally balance,

frequently finger and handle bilaterally, occasionally operate a motor vehicle, and only

occasionally tolerate heat, cold, dust, smoke and fumes.  (Tr. 762-763.)  Nor did the ALJ

acknowledge or address Dr. Shah's opinion Larkin's symptoms were severe enough to

"constantly" interfere with the attention and concentration needed to perform simple work tasks.

(Tr. 763.)  In light of the fact none of these restrictions appear in the RFC, it is clear the ALJ

implicitly rejected them.[12]

   The only reasons provided by the ALJ for rejecting Dr. Shah's May 2010 opinion are

that (1) it is "not consistent with the record as a whole," and (2) "Dr. Shah's records do not

mention a recommendation for the claimant to elevate her legs prior to December 31, 2010."  (Tr.

31.)  While the second reason provided may be sufficient to address Dr. Shah's specific opinion

that Larkin would need to elevate her legs, the Court finds the ALJ failed to offer "good reasons"

---

[12] The only limitation offered by Dr. Shah in his May 2010 opinion that may have been
accepted by the ALJ, at least in part, was his opinion Larkin was limited to occasional
reaching.  (Tr. 762.)  However, the Court notes Dr. Shah's opinion defines the term
"reaching" as "extending hand and arm in any direction below shoulder level."  (*Id.*)
While the RFC includes a restriction to occasional overhead reaching bilaterally, it does
not limit Larkin's ability to reach below shoulder level.  (Tr. 28.)  Thus, the ALJ rejected
this aspect of Dr. Shah's May 2010 opinion as well.

for rejecting the many other limitations set forth in Dr. Shah's opinion, including most notably his opinions regarding Larkin's abilities to sit; stand; lift/carry; stoop; balance; finger and handle bilaterally; operate a motor vehicle; tolerate heat, cold, dust, smoke and fumes; sustain attention and concentration for simple tasks; and have four or more absences per month.

The only reason provided by the ALJ for rejecting these particular limitations is that Dr. Shah's May 2010 opinion is "inconsistent with the record as a whole." (Tr. 31.)  The Sixth Circuit has made clear, however, that an ALJ's conclusory and unexplained statement that a treating physician opinion is inconsistent with the medical evidence of record, does not constitute a "good reason" for rejecting these opinions.  *See, e.g., Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 552 (6th Cir. April 28, 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.")*; Rogers*, 486 F.3d at 245–46 (finding an ALJ failed to give "good reasons" for rejecting the limitations contained in a treating source's opinion where the ALJ merely stated, without explanation, that the evidence of record did not support the severity of said limitations); *Bartolome v. Comm'r of Soc. Sec.*, 2011 WL 5920928 (W.D. Mich. Nov.28, 2011) (noting that merely citing to "the evidence" and referring to the appropriate regulation was insufficient to satisfy the "good reasons" requirement); *Patterson v. Astrue*, 2010 WL 2232309 (N.D. Ohio June 2, 2010) (remanding where the "ALJ did not provide any rationale beyond his conclusory statement that [the treating physician's] opinion is inconsistent with the objective medical evidence and appears to be based solely on [claimant's] subjective performance."); *Fuston v. Comm'r of Soc. Sec.*, 2012 WL 1413097 (S.D. Ohio Apr.23, 2012) (finding the ALJ

35

deprived the court of meaningful review where the ALJ discarded a treating physician's opinion

without identifying any contradictory evidence or explaining which findings were unsupported).

The Commissioner argues remand is not required because the ALJ discussed Dr. Shah's

treatment history with Larkin earlier in the decision.  This argument is without merit.  While the

ALJ recited some of the medical evidence earlier in the decision, he failed to offer any

meaningful *explanation* for his conclusion that Dr. Shah's May 2010 opinion was inconsistent

with that evidence.  *See Blackburn v. Colvin*, 2013 WL 3967282 at * 8 (N.D. Ohio July 31,

2013); *Cassels v. Comm'r of Soc. Sec*., 2016 WL 3097150 at * 4 (S.D. Ohio June 3, 2016) ("The

ALJ, for example, 'does not offer any explanation for his conclusion' that "the treating

physician's opinions were inconsistent with the medical evidence,' which is enough by itself for

error.")  Moreover, as Larkin correctly notes, the ALJ's discussion of Dr. Shah's treatment

records is sparse, at best, and fails to acknowledge any of Dr. Shah's many abnormal physical

examination findings.  Specifically, the ALJ summarizes Dr. Shah's five year treatment history

with Larkin as follows:

> In terms of the claimant's alleged pain, she has been treated by Bharat Shah, M.D.,
> at Comprehensive Pain Care Centers, since at least 2005 (Exhibit lF/2), for
> diagnoses including lumbar spondylosis, degeneration of lumbar or lumbosacral
> intervertebral disc degeneration of thoracic or thoracolumbar intervertebral disc.
> Treatment has included lumbar facet injections, medication such as Oxycontin,
> Celebrex, Neurontin and Flexeril (Exhibit 1, 3F, 9F).  Dr. Shah repeatedly
> indicates the claimant has normal muscle strength, normal sensation, normal
> reflexes and a normal gait (Exhibit lF/4, 3F/3, 18; 52, 53).

(Tr. 29.)  The ALJ also notes Larkin had "never undergone surgery" and was treated with

injections and a pain pump.  (*Id*.)  With regard to the pain pump, the ALJ states only it was

implanted in June 2009 and that, while Larkin testified the morphine made her tired, she denied

medication side effects after the pump was implanted.  (*Id*.)

36

For the following reasons, the Court finds the ALJ's brief discussion of the medical evidence earlier in the decision fails to cure the deficiencies in his evaluation of Dr. Shah's May 2010 opinion.  Although the ALJ highlights Dr. Shah's benign examination findings, the decision fails entirely to acknowledge the many abnormal findings documented in Dr. Shah's treatment notes.  Notably, the ALJ fails to address Dr. Shah's consistent findings of abnormal reflexes, moderate tenderness to palpation in Larkin's neck and lower back, pain with flexion and extension of the lumbar spine, facet tenderness over the thoracic spine and mid-upper lumbar area, shoulder tenderness and painful range of motion, and decreased range of motion and pain in Larkin's left knee.  (Tr. 524-526, 545, 547-550, 560-561, 565-566, 573-575, 579-580, 695-696, 712-713.)  Nor does the ALJ acknowledge or address Dr. Shah's frequent notations that Larkin was in moderate or moderately severe pain during her visits.  (Tr. 573, 578, 695, 712.)

Furthermore, while the ALJ notes Larkin was surgically implanted with a pain pump in June 2009, he fails to address treatment notes documenting her continued complaints of pain.  (Tr. 699-708, 711-716.).  The ALJ also fails to acknowledge the fact Dr. Shah repeatedly increased the dosage of Larkin's pain pump, from 0.5 mg/day in June 2009 to 3.497 mg/day by June 2010.  (Tr. 727-728, 773.)  Courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light, and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir.2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 Fed. Appx 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, 2015 WL 1757474 at * 6

37

(S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, 2013 WL 943874 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding."); *Johnson v. Comm'r of Soc. Sec.*, 2016 WL 7208783 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes."); *Taylor v. Comm'r of Soc. Sec.*, 2014 WL 1874055 at * 4 (N.D. Ohio May 8, 2014) (stating that it "is clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record, or by selectively parsing that record—i.e., 'cherry-picking' it—to avoid analyzing all the relevant evidence. This is particularly so when the evidence ignored is from a treating physician.")

The Commissioner nonetheless argues remand is not required because "the ALJ considered that Plaintiff's activities were inconsistent with the extreme limitations in Dr. Shah's opinions." (Doc. No. 13 at 18.)  This argument is without merit.  As an initial matter, the ALJ's description of Larkin's daily activities is partially inaccurate.  Specifically, the ALJ states that "in March 2009, prior to the morphine pump, Ms. Larkin was able to babysit her sister's grandson, wash the floor, clean the tub, shower, shop, shampoo carpets, drive and go to North Carolina to visit her mother."  (Tr. 30.)  However, as the Commissioner herself acknowledges (Doc. No. 13 at 13), the ALJ misstated the evidence when he found Larkin could wash floors, clean the tub, shower, shop for food by herself, and shampoo carpets.  In fact, these are all activities Larkin indicated she could *not* do, because of her pain.  (Tr. 414.)

Morever, the mere fact Larkin acknowledged some rather minimal level of activities, performed with some difficulty, is not necessarily indicative of an ability to perform substantial gainful activity for 8 hours a day.  *See e.g., Kalmbach v. Comm'r of Soc. Sec*., 409 Fed.Appx. 852, 864 (6th Cir. 2011) (finding the claimant's ability to prepare her own meals, dress herself independently, drive short distances and go to the grocery store, pharmacy and church constituted "minimal activities [that] are hardly consistent with eight hours' worth of typical work activities"); *Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967) ("[t]he fact that [a claimant] can still perform simple functions, such as driving, grocery shopping, dish washing, and floor sweeping does not necessarily indicate that this [claimant] possesses an ability to engage in substantial gainful activity. Such activity is intermittent and not continuous, and is done in spite of pain suffered by [claimant]."); *Hall v. Celebrezze*, 314 F.2d 686, 690 (6th Cir. 1963) ("It was not necessary that [the claimant] be bedridden or wholly helpless in order to establish his claim for benefits.")  *See also Osterland v. Colvin*, 2016 WL 4576092 at * 10 (N.D. Ohio Aug. 11, 2016).  Under the circumstances, the Court finds Larkin's ability to perform some household chores (with assistance and difficulty)[13] and to occasionally travel to visit her mother does not constitute a "good reason" for rejecting Dr. Shah's opinions.

Finally, the Commissioner asserts other record evidence is inconsistent with Dr. Shah's opinions, including the state agency physicians' opinions and Larkin's alleged improvement after implantation of the pain pump.  The Commissioner, however, cannot cure a deficient opinion by offering explanations that were not offered by the ALJ.  As courts within this district have noted,

---

[13] For example, Larkin testified she had to sit on a stool to cook dinner or do the dishes, and had to sit down to vacuum.  (Tr. 116-117, 120.)

39

"arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's 'post hoc rationale' that is under the Court's consideration."  See, e.g., Blackburn, 2013 WL 3967282 at * 8; Cashin v. Colvin, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); Jaworski v. Astrue, 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012).  Here, the various arguments now advanced by the Commissioner were not articulated by the ALJ as reasons for rejecting Dr. Shah's May 2010 opinion.  Accordingly, this Court rejects the Commissioner's post hoc rationalizations.[14]

In sum, the Court finds the ALJ failed to set forth good reasons for rejecting the limitations assessed by Dr. Shah in his May 2010 opinion.  Accordingly, the Court recommends a remand is necessary, thereby affording the ALJ the opportunity to properly address the physical functional limitations assessed by Dr. Shah therein.

It is further recommended that, on remand, the ALJ should also provide greater

---

[14]  In any event, even if the ALJ had offered these reasons for rejecting Dr. Shah's opinions, the Court is not convinced they would constitute "good reasons" for purposes of social security regulations.  While the Commissioner notes Dr. Shah's opinions are inconsistent with the state agency physicians' opinions, the Sixth Circuit has rejected the argument that it is sufficient to reject a treating physician's opinion solely on the basis that it conflicts with the medical opinions of nontreating and nonexamining doctors. See Gayheart, 710 F.3d at 377 ("Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight t treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.") Moreover, Larkin testified that, while the pain pump helped relieve some of her pain, she continued to suffer pain in her lower back, shoulders, and knees even after the pump was implanted.  (Tr. 46-47, 117.) Indeed, Dr. Shah's treatment notes reflect Larkin continued to complain of pain after the pain pump was implanted in June 2009, and, further, that her pain pump dosage and concentration were repeatedly increased.  See e.g., Tr. 699-708, 711-716.

explanation regarding his analysis of Dr. Shah's March 2009 opinion Larkin should not "be involved with lifting, pushing or pulling."  (Tr. 587-588.)  The ALJ's rejection of this opinion on the grounds it "is not consistent with the record as a whole" suffers from the same defects discussed above in connection with Dr. Shah's May 2010 opinion.  (Tr. 30.)  Moreover, the Court questions the basis for the ALJ's unexplained statement that "back pain does not a support a complete limitation against lifting."[15]  (*Id*.)  Nor is it clear why the fact Dr. Shah did not know the precise degree of Larkin's lumbar range of motion warrants the wholesale rejection of his opinion regarding Larkin's abilities to lift, push, and pull.

Accordingly, and for all the reasons set forth above, it is recommended this matter be remanded to allow the ALJ the opportunity to properly address the physical functional limitations

---

[15] Neither this Court or the ALJ have the special expertise necessary to make such a determination.  The ALJ's finding that "back pain does not support a complete limitation against lifting," despite Dr. Shah's opinion to the contrary, essentially constitutes the ALJ's interpretation of the medical data of record.  ALJs, however, are not trained medical experts and it is well-established that they may not substitute their own opinion for that of a medical professional.  *See, e.g., Meece v. Barnhart*, 192 Fed. Appx. 456, 465 (6th Cir. 2006) ("[T]he ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence."); *Pietrunti v. Director, Office of Workers' Comp. Programs, United States DOL*, 119 F.3d 1035, 1044 (2nd Cir.1997); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir.1990) ( "But judges, including [ALJs] of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.")); *accord Winning v. Comm'r of Soc. Sec.*, 661 F.Supp.2d 807, 823–24 (N.D. Ohio 2009) ("Although the ALJ is charged with making credibility determinations, an ALJ 'does not have the expertise to make medical judgments.'"); *Stallworth v. Astrue*, 2009 WL 335317 at *9 (S.D. Ohio, Feb. 10, 2009) ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record.") (quoting *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)).   *See also Mascaro v. Colvin*, 2016 WL 7383796 at * 11 (N.D. Ohio Dec. 1, 2016); *Brewer v. Astrue*, 2011 WL 2461341 at * 6 (N.D. Ohio June 17, 2011).

assessed by Dr. Shah in his March 2009 and May 2010 opinions.

***Medical Experts Dr. Brahms and Dr. Kravitz***

In her second assignment of error, Larkin argues the ALJ failed to properly evaluate the

testimony of medical experts Dr. Brahms and Dr. Kravitz, both of whom testified during the

September 2013 hearing.  (Doc. No. 11 at 18-20.)  She maintains the ALJ failed to provide "any

explanation whatsoever" for rejecting (1) Dr. Brahms' opinion Larkin could never climb ramps or

stairs; and (2) Dr. Kravitz's opinion Larkin was limited to "less than sedentary" work; i.e., could

not sit for six hours per day.  (*Id*. at 19.)

The Commissioner argues the ALJ properly considered the opinions of Drs. Brahms and

Kravitz.  (Doc. No. 13 at 18.)  She maintains "the ALJ thoroughly discussed the evidence of

record, finding that it showed little in the way of objective findings, reflected improvement with

treatment, and activities suggesting greater ability than Plaintiff alleged."  (*Id.* at 19.)  Finally, the

Commissioner argues an ALJ may accord "great weight" to a state consultant's opinion (as he did

herein with regard to Dr. Brahms) but "this does not mean that the opinion was entirely adopted,

nor is the ALJ required to do so."  (*Id.*)

An ALJ can properly rely on the testimony of a non-examining medical expert in order

to make sense of the record.  *See Buxton v. Halter*, 246 F.3d 762, 775 (6th Cir. 2001); *Dalton v.

Colvin*, 2014 WL 301443 at * 6 (S.D. Ohio Jan. 28, 2014), *report and recommendation adopted*,

2014 WL 661597 (S.D. Ohio Feb. 19, 2014).  An ALJ's reliance on the opinion of a

non-examining medical expert is proper if the expert's opinion is based on objective reports and

opinions.  *See Barker v. Shalala*, 40 F.3d 789, 794–95 (6th Cir. 1994); *Loy v. Sec'y of Health &

Human Servs.*, 901 F.2d 1306, 1308–09 (6th Cir. 1990); *Majors v. Colvin*, 2014 WL 1238477 at *

6 (N.D. Ohio March 25, 2014).

However,  ALJs "are not required to adopt any prior administrative medical findings" made by State agency medical or psychological consultants, or other program physicians or psychologists.  20 C.F.R. § 404.1513a(b)(1).  *See also* 20 C.F.R § 404.1527(e).  Because "our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation," ALJs must consider their findings and opinions.  *Id*.  When doing so, an ALJ will evaluate the findings using the relevant factors in §§ 404.1520b, 404.1520c and 404.1527, such as the consultant's medical specialty and expertises, the supporting evidence in the case record, consistency of the consultant's opinion with evidence from other sources in the record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions.  20 C.F.R. § 404.1513a(b)(2).  Finally, an ALJ must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant unless a treating physician's opinion has been accorded controlling weight.  *See* 20 C.F.R § 404.1527(e).

As noted *supra*, medical expert Dr. Brahms testified during the September 10, 2013 hearing.  (Tr. 92-94.)  Dr. Brahms concluded Larkin was a "moderately obese individual who complains of low back pain, pain in the cervical region, knee pain, right shoulder pain, and elbow pain." (Tr. 92.)  He opined Larkin was limited to sedentary work as far back as 2007.  (Tr. 93.)  Dr. Brahms also testified Larked could not climb ramps and stairs on an occasional basis; could never climb ladders, ropes, or scaffolds; and was limited to occasional overhead reaching.  (Tr. 93-94.)

ME Dr. Kravitz also testified during the September 10, 2013 hearing.  (Tr. 94-97.)  Dr.

43

Kravitz first indicated he was a specialist in internal medicine with a sub-specialty in

cardiovascular medicine.  (Tr. 95.)  With regard to Larkin's RFC, Dr. Kravitz testified as follows:

> Q:    Doctor, are you able to give me a residual functional capacity
>       assessment for Ms. Larkin?
>
> A:    Yes, sir.  Your Honor, I -- I want to point out that this lady requires a
>       constant morphine drip with an apparatus in her -- in her spine, sort of
>       like a bag that's filled periodically with morphine and -- and drips out.
>       That's the only way she can function.  **The answer to your question is
>       that her RFC is less than sedentary.  I do not believe she could do
>       any other sedentary activities as defined.**
>
> Q:    **So you're saying that she would not be able to sit for six hours out
>       of an eight-hour day?**
>
> A:    **No, sir, Your Honor .**

(Tr. 96) (emphasis added).

> The ALJ evaluated the opinions of Drs. Brahms and Kravitz as follows:
>
> Medical experts Dr. Brahms and Dr. Kravitz testified at a prior hearing on
> September 10, 2013.  The undersigned gives great weight to the opinion of Dr.
> Brahms, who opined that Ms. Larkin was capable of sedentary work with only
> occasional overhead reaching.  The undersigned  only gives partial weight to the
> opinion of medical expert Dr. Kravitz, who said the claimant was capable of work
> at less than the sedentary level of exertion.  His opinion is not consistent with the
> medical evidence of record.

 (Tr. 31.)  No further discussion or evaluation of these opinions is provided.

The Court finds the ALJ failed to properly evaluate the opinions of either Dr. Brahms or

Dr. Kravitz.  With regard to Dr. Brahms, the ALJ purports to accord "great weight" to Dr.

Brahms' testimony but fails to acknowledge or address his opinion Larkin "could not climb ramps

and stairs on an occasional basis."  (Tr. 93-94.)  As noted above, the RFC directly conflicts with

this opinion, providing Larkin can "occasionally climb ramps or stairs."  (Tr. 28.)  While the

Court agrees with the Commissioner that an ALJ need not adopt a medical expert's opinion

"verbatim" when assigning it "great weight," the ALJ herein failed to even acknowledge Dr. Brahms' opinion regarding Larkin's inability to occasionally climb ramps and stairs.  Although an ALJ need not provide "good reasons" for discounting a medical expert opinion, here, the ALJ's conclusory discussion of Dr. Brahms' testimony, combined with his failure to thoroughly discuss the medical evidence earlier in the decision, necessitates an explanation for the implicit rejection of this particular limitation.  This is particularly so given that the RFC directly conflicts with Dr. Brahms' opinion on this issue.

The Court also finds the ALJ failed to properly evaluate Dr. Kravitz's opinion.  (Tr. 96.) The ALJ purported to provide "partial weight" to Dr. Kravitz's opinion Larkin was limited to work at a "less than sedentary" level, stating it was "not consistent with the medical evidence of record."  (Tr. 31.)  The ALJ, however, does not articulate which parts of Dr. Kravitz's opinion were accorded some weight and which were rejected.  Moreover, the ALJ does not acknowledge, at any point in the decision, Dr. Kravitz's specific opinion Larkin would not be able to sit for 6 hours in an 8 hour workday.  As the RFC does not contain any additional sitting restrictions, it is clear the ALJ rejected this opinion.  The ALJ, however, provides no meaningful explanation for doing so, other than his conclusory statement that Dr. Kravitz's opinion is "not consistent with the medical evidence of record."  (Tr. 31.)  Given the ALJ's failure to thoroughly and accurately discuss the medical evidence earlier in the decision, the Court finds the ALJ's statement insufficient.

As noted *supra*, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer*,

45

774 F.Supp.2d at 877.  *See also McHugh*, 2011 WL 6130824; *Hook*, 2010 WL 2929562.  Here, the ALJ failed to sufficiently articulate his reasoning for rejecting (1) Dr. Brahm's opinion Larkin could not climb ramps or stairs occasionally, and (2) Dr.  Kravitz's opinion Larkin would not be able to sit for 6 hours in an 8 hour workday.

Accordingly, and for all the reasons set forth above, it is recommended this matter be remanded to allow the ALJ the opportunity to properly address the physical functional limitations assessed by Drs. Brahms and Kravitz during the September 2013 hearing.

*Credibility*

In her final assignment of error, Larkin argues the ALJ failed to properly evaluate her credibility.  (Doc. No. 11 at 20.)  She maintains the ALJ mischaracterized her activities of daily living and improperly concluded Larkin's "description of her back pain is much milder than what she alleges in her application."  (*Id*. at 21.)

The Commissioner acknowledges the ALJ "did misstate the evidence" regarding the nature and scope of Larkin's activities of daily living.  (Doc. No. 13 at 13.)  Nonetheless, she maintains the ALJ provided several other valid reasons for finding Larkin's allegations less than fully credible, including the relatively benign objective imaging results, the fact she had never had surgery, and the lack of support in the record for Larkin's alleged need to elevate her legs. (*Id*. at 10-14.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs*., 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for

46

evaluating these symptoms.  *See e.g, Massey v. Comm'r of Soc. Sec.*, 2011 WL 383254 at * 3 (6th

Cir. Feb. 7, 2011).  First, the ALJ must determine if there is an underlying medically determinable

physical or mental impairment that could reasonably be expected to produce a claimant's

symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's]

symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity

for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 96–7p, 1996 WL 374186 (July 2, 1996).[16]

Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must

(1) examine whether the objective medical evidence supports a finding of an underlying medical

condition; and, if so, (2) whether the objective medical evidence confirms the alleged severity of

pain arising from the condition or whether the objectively established medical condition is of

such a severity that it can reasonably be expected to produce the alleged disabling pain.  *Duncan

v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986).  *See also Felisky v.

Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994); *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. Appx.

828, 834 (6th Cir. June 23, 2005).

        If these claims are not substantiated by the medical record, the ALJ must make a

credibility determination of the individual's statements based on the entire case record.

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See

Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers*, 486 F.3d

at 248 ("noting that "credibility determinations regarding subjective complaints rest with the

ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be

_____

[16]  SSR 16-3p supercedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), which was in
effect at the time of the October 20, 2015 hearing.  Here, both parties agree SSR 96-7p
was in effect at the time of the ALJ decision.  (Doc. No. 11 at fn 2; Doc. No. 13 at fn 3.)

discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96–7p, Purpose Section, 1996 WL 374186 (July 2, 1996); *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").[17]

As it is recommended this matter be remanded to allow the ALJ the opportunity to properly address the opinions of Drs. Shah, Brahms, and Kravitz, the Court need not address the parties' arguments with respect to the ALJ's credibility analysis.  However, given the fact the ALJ misstated the evidence regarding the nature and scope of Larkin's daily activities, it is recommended on remand the ALJ revisit his credibility analysis based on an accurate description of Larkin's statements and testimony regarding this issue.

---

[17] SSR 16-3p similarly provides that an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029 at *9.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends the Commissioner's final decision be VACATED and the case REMANDED for further proceedings consistent with this decision.

_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: April 11, 2018

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**